[No. 1407.  Decided January 10, 1895.]

## THE STATE OF WASHINGTON, *Respondent, v.* HENRY M. COCHRAN, *Appellant.*

### SEDUCTION—SUFFICIENCY OF INDUCEMENT

Carnal intercourse with an unmarried girl of sixteen years of age, attained by overpowering and tickling her until she yields, accompanied merely by promises of not getting her into trouble and of willingness to do anything in the world for her, does not constitute seduction. (HOYT, J., dissents.)

*Appeal from Superior Court, Chehalis County.*

*J. R. Cowden* and *Robinson & Linn*, for appellant.

*George D. Schofield*, Prosecuting Attorney, and *James A. Haight*, for the State.

The opinion of the court was delivered by

Scott, J.—The defendant was convicted of the crime of seduction. One of the grounds upon which his appeal is based is that the evidence does not sustain the charge. The girl alleged to have been seduced was employed as a domestic in a family with whom the defendant and his family were living, and was sixteen years of age. She testified that the defendant had intercourse with her upon three different days within two weeks during the time of her said employment; that the first time he attempted to do so was when she had been there about three weeks; that the next attempt was six weeks later; that he tried it again about Christmas time, which was several weeks later, and again in February, but did not succeed at any of said times. Upon the day last referred to, a second attempt was made, about which she testified as follows:

"He went down town again, and she (his wife) came home, and I went to bed. I fell to sleep, and all at once I heard some one at the door, whispering ' Katie '; I looked up and there was a man with a long coat on in the room. I was so frightened I couldn't speak hardly, but I told him to go.

Question. Did you recognize him at that time?
Answer. Yes.
Q. Go on and state what occurred there at that time.
A. He took off his hat, coat and shoes and went into bed with me.
Q. What did you do?
A. I went as near the wall as I could, and told him to go or I would holler; he didn't take any notice of that, but got on top of me and held me fast. I began to cry and struggle, and said I would holler.
Q. What did he do when he got into bed with you?
A. Went on top of me.
Q. How long did he remain there that time?
A. Twenty or twenty-five minutes.
Q. State whether or not he made you any promises; state what he said on that occasion?
A. He promised that he would never get me into trouble, and that he would do anything in the world for me, if I would let him do as he wanted me to.
Q. What did you tell him?

A. I told him I would never, that I would rather die.

Q. How long was he there?

A. Twenty or twenty-five minutes, somewhere around there.

Q. Well, do you remember of him making any remark at that time as to the condition in which you were?

A. He said, I won't plague you any more, there is no use trying; I won't plague you any more if you will keep quiet. I thought he would keep his word, so I staid there.

Q. Did you tell him what you would do if he did not stop troubling you in that way?

A. I said I would go and leave the place; that I wasn't allowed to stay in such a place."

With reference to the first time he had intercourse with her, and directly following the foregoing testimony, she testified as follows:

"Question. When did he show any other attention to you after that; when was the next time?

Answer. The latter part of March.

Q. You may now state to the jury the circumstances at that time.

A. Well, I went to bed and—

Q. Is this the time now that you are about to testify, the time of the offense that the defendant stands charged?

A. Yes.

Q. Go on and state fully.

A. I went to bed and pretty soon I went to sleep; after a while I heard something move the bed, I looked up and he was there. I got frightened and told him to go. He said he would not, and that he would stay until morning, unless I let him do as he wanted to. I said I would never, and he still said he would not go. I struggled so long that I was all tired out and he overpowered me. I couldn't help myself any longer.

Q. What means did he use to overpower you at that time?

A. I fought so long I couldn't move no more.

Q. State the manner in which he overpowered you.

A. He held me tight.

Q. What else; did he tickle you any?

A. Yes.

Q. State whether or not you are ticklish.

A. Yes.

Q. Go on and state what else was done there at that time.

A. I don't know what you mean.

Q. What promises did he make, if any?

A. He said he wouldn't get me into trouble for anything in the world. He says, 'There is no danger, trust to me and you will be all right.'

Q. He got into bed with you at that time, did he?

A. Yes.

Q. Now did he have on all his wearing apparel at that time?

A. He took off his hat, coat, shoes and waist. .

Q. What do you mean by his waist?

A. His vest.

Q. Were you frightened?

A. Yes.

Q. Well, state what occurred there, what was the first thing done?

A. He got on me and held me so tight that I couldn't move, and he said he wouldn't go until morning unless I let him do as he wanted to. I said I would never give up, and that I would rather die than do anything wrong; then he tickled me, and I had to give up, I couldn't help myself any longer.

Q. You had finally to give up that time?

A. Yes.

Q. Now, did he have connection with you on this occurrence?

A. Yes.

Q. How long did he remain there, Miss Katie?

A. I don't exactly know; about half an hour.

Q. Your best judgment on that?

A. Oh, half an hour or less.

Q. You say he stayed there half an hour or less, what did he do then?

A. Well, he fought and I struggled—

Q. I mean after you had been overcome, and he had accomplished his purpose, and been there half an hour, what did he do then?

A. Then he went out."

As to the succeeding times she testified as follows:

"Q. Now, Katie, when was the next time he paid you any particular attention?

A. That was about a week afterwards, in April.

Q.    Now you may state to the jury the circumstances on that occasion.

A.    After that I blocked the door with plants.

Q.    What do you mean by that?

A.    I put two flower plants against the door, because I couldn't lock it.

Q.    What articles of furniture were in the room at that time?

A.    Nothing but a bed, two flower pots and a mirror.

Q.    Were there any chairs?

A.    No, but there was a trunk in the closet.

Q.    Go on and state to the jury; you say you blocked the door that night, go on and state what occurred.

A.    He came through the window.

Q.    How do you know he did?

A.    He told me so, and when he went out he pushed the plants away.

Q.    Were the plants against the door when he left?

A.    Yes.

Q.    What occurred that night?

A.    The same thing happened again. I said the last time that I would never let him do it again, and he only laughed at me and made promises again and tickled me until I let him.

Q.    What did he say, if anything, when he tickled you?

A.    He said, 'Will you let me?'

Q.    How long was he there that time?

A.    Well, about the same length of time, maybe longer.

Q.    When did you first know he was in the room?

A.    When he came into the bed.

Q.    Did he have his clothes on when he came into your bed?

A.    Well, he had his pants and shirt on.

Q.    When was the next time, you say this was about the first part of April?

A.    The next time was about five days afterwards.

Q.    Now, before we leave this other time you may state when you were unwell last, with reference to the first of April?

A.    The first days in April as near as I could tell.

Q.    This occurrence which you have testified to was shortly after you had been unwell in April?

A.    Yes.

Q.    When was the next occasion that he took any liberties with you?

A.   The 10th or 12th of April.   I still had the plants at the door and he pushed them away.

Q.   He came through the door, did he?

A.   Yes; then he took off his coat and hat and shoes and came into bed again.   I said 'You here again.   I thought you promised you would never come again.'   He said, 'Yes, I am coming here all the time.'   I says, 'See that you are here the last time.'   I didn't intend to stay there any longer.

Q.   Did he get in bed with you that time?

A.   Yes.

Q.   Did he have connection with you?

A.   Yes.

Q.   How long did he remain there?

A.   It seemed to me a long time, about an hour; it may have been only half an hour, I didn't have any watch.

Q.   Where was Mrs. Cochran?

A.   I don't know; maybe she was in bed, I couldn't swear.

Q.   Where were the children?

A.   They were in bed, too, I guess.

Q.   You may state what was done on each one of these occasions which you have testified to, as to whether you struggled or not?

A.   Yes.

Q.   You may state what promises, if any, he made during the occasion of the latter part of March, that is the time of the charge in the information?

A.   Well, he promised that he would not get me into trouble, and he said, 'I think the world of you.'

Q.   After the 10th day of April, this last time you testified to, how long did you remain at the Cochran residence?

A.   A little over a week."

With reference to the time in February, upon cross-examination, she testified as follows:

"Q.   Well, you didn't know the doctor until he spoke to you?

A.   I knew him right away; because he said, 'I'll come in your bedroom.'   I said it wouldn't be well for him if he did; I said I'll scratch your eyes out.

Q.   You didn't say you would holler if he came?

A.   I said that before.

Q.   Before he came?

A.   He didn't say for sure he would come, I thought he was just joking.

Q. When did he tell you he was coming in your bed-room?

A. I don't exactly know when, he said so several times.

Q. You told him if he came in your bed you would scratch his eyes out? And said you would holler?

A. Yes.

Q. And that he would be discovered?

A. Yes.

Q. Did you holler?

A. No.

Q. Why not?

A. I thought I would after I couldn't fight any longer.

Q. Why didn't you cry out when you first saw him in the room?

A. I was so frightened right away I didn't know where I was."

Leaving out of consideration the contradictory and unsatisfactory nature of her testimony, which, of course, was mainly a question for the jury, and which we have not attempted to show, and making all due allowance for her age and inexperience, it seems to us that the state failed to make a case of seduction. Statutes like the one upon which this prosecution is founded are not designed to punish mere illicit intercourse.

"In addition to this, the complainant relying upon some sufficient promise or inducement, and without which she would not have yielded, must have been drawn aside from the path of virtue she was honestly pursuing at the time the offense charged was committed." *People v. Clark*, 33 Mich. 112.

They are designed to punish "the seducer, who by his arts and persuasions prevails over the chasity of an unmarried woman, and who thus draws her aside from the path of duty and rectitude she was pursuing"; *id.* There was no promise made, or inducement held out to the prosecutrix in this case which possibly could have induced her to submit to having sexual intercourse with the defendant.

Some months before the commission of the act, when he first attempted it, he told her he would do anything in the world for her, and that if he got her into trouble he would get her out of it; that no one would ever find it out, etc.,

and that he repeated it in substance upon the occasions following. But these were utterly insufficient to sustain the conviction. All promises or representations are not sufficient for that purpose, and while the exact amount or what kind of seductive arts is necessary cannot be defined, and must depend upon the peculiar circumstances of each case, taking into consideration the age and intelligence of the parties, it is yet evident that they must be of a character to gain the confidence of the woman and sufficient to exert an undue influence over her generally. *Breon v. Henkle*, 14 Or. 494 (13 Pac. 289); *State v. Fitzgerald*, 63 Iowa, 268 (19 N. W. 202); *Baird v. Boehner*, 72 Iowa, 318 (33 N. W. 694).

As to bare promises, although the statute says nothing upon the subject, none other than a promise to marry should be held sufficient. In such a case a woman might yield, thinking she was doing no wrong, but if she voluntarily sells her virtue for money, position or like recompense, the man should not be held guilty of seduction, whatever other offense he may be guilty of. Other inducements should be of a character other than those calculated to excite the amorous passions of the woman at the particular time, which she fully comprehends, knowingly permits, and willingly responds to, if at all. In the case of *State v. Carter*, 8 Wash. 272 (36 Pac. 29), in speaking of this subject we perhaps went to an extreme length in holding slight matters of inducement sufficient. But there the prosecutrix was but twelve years of age when they were made, and it was evident that the defendant exercised a considerable and continued influence over the child generally. In this case the complaining witness was old enough to understand the designs of the defendant, and as a matter of fact she testified that she knew. She also knew that he was a married man at the time. And there was nothing in his conduct other than acts calculated to excite her passions. That he did not gain her confidence is apparent from her testimony. There were no other advances proven than the ones specified, which were made at intervals of several weeks. We are not at liberty to presume that there were any in the absence of any such

proof. In fact her consent to intercourse can only be inferred from her conduct, viz., that she made no outcry and informed no one, for according to her testimony she continually resisted him and her resistance was overcome through exhaustion, etc. This savors more of rape than seduction, and while it may not have amounted to rape, as after more or less resistance she probably consented, although she evidently wanted to convey a different impression, we are of the opinion that there was no proof of seduction. If this conviction could be sustained, proof of the bare fact of intercourse could as well be held sufficient, and it is only necessary to say that the law requires more than that to constitute the particular offense.

Reversed with an instruction to dismiss the case.

DUNBAR, C. J., and ANDERS and STILES, JJ., concur.

HOYT, J. (*dissenting*).—I dissent. I think that there were such promises and undue influence shown as to warrant a conviction. A man of mature years who induces a young girl to consent to illicit intercourse should be held responsible for even slight promises.